CONNECTICUT INSURANCE GUARANTY ASSOCIATION *v.* UNION CARBIDE CORPORATION ET AL.
(13934)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

Argued November 7, 1990—decision released February 5, 1991

*Joseph C. Tanski,* with whom were *Arthur W. Young III, Charles W. Pieterse* and, on the brief, *James A. Fulton* and *Douglas S. Skalka,* for the appellant-appellee (plaintiff).

*Robert E. Crotty,* with whom were *Taggart D. Adams* and *Neil Merkl,* for the appellee-appellant (named defendant).

SHEA, J. The plaintiff, Connecticut Insurance Guaranty Association (CIGA), brought this declaratory judgment action for the purpose of resolving certain issues relating to its obligation pursuant to the Connecticut Insurance Guaranty Association Act, General Statutes §§ 38-273 through 38-289, to reimburse the defendant Union Carbide Corporation (UCC) for claims arising out of a chemical plant disaster in Bhopal, India, which were covered by liability policies insuring UCC issued by insurance companies that have become insolvent. Cross motions for summary judgment were filed by CIGA and UCC and the trial court rendered a declaratory judgment in favor of UCC upon three of the five issues presented, concluding that two of the issues could not be decided on the basis of the record. The court ruled that: (1) the definition of a "covered claim" in General Statutes § 38-275 (4),[1] which CIGA is obligated

---

[1] At the time of the loss, in December, 1984, General Statutes § 38-275 (4) provided as follows: " 'Covered claim' means an unpaid claim, including

to pay, refers to the claim of each Bhopal victim and not the aggregate demand of UCC to be reimbursed for all the claims it has paid from noninsurance sources as a result of the insolvency of three of its insurers; (2) CIGA must reimburse UCC for paying all claims of the Bhopal victims covered by the policies of the insolvent carriers, because UCC "now stands in the shoes" of those companies, subject to the maximum of $300,000 for each victim's claim as provided by General Statutes § 38-278 (1) (a) (ii);[2] and (3) CIGA must also pay for UCC's costs of defense and settlement. The court deemed the record insufficient to render a declaratory judgment on the two remaining issues:

---

but not limited to, one for unearned premiums, which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this chapter applies issued by an insurer, if such insurer becomes an insolvent insurer after October 1, 1971, and (a) the claimant or insured is a resident of this state at the time of the insured event; or (b) the property from which the claim arises is permanently located in this state, provided the term 'covered claim' shall not include any amount due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise."

This provision was renumbered subsection (6) and extensively revised by Public Acts 1987, No. 87-290, § 1, and Public Acts 1988, No. 88-76, § 2.

[2] At the time of the loss, General Statutes § 38-278 (1) (a) (ii) provided as follows: "(1) Said association shall: (a) Be obligated to the extent of the covered claims existing prior to the determination of insolvency and arising within thirty days after the determination of insolvency, or before the policy expiration date if less than thirty days after the determination, or before the insured replaces the policy or causes its cancellation, if he does so within thirty days of such determination, provided such obligation shall be limited as follows . . . (ii) with respect to covered claims other than for unearned premiums, such obligation shall include only that amount of each such claim which is in excess of one hundred dollars and is less than three hundred thousand dollars, except that said association shall pay the full amount of any such claim arising out of a workers' compensation policy, provided in no event shall said association be obligated to any policyholder or claimant in an amount in excess of the obligation of the insolvent insurer under the policy form from which the claim arises or for any claim filed with the association after the expiration of two years from the date of the declaration of insolvency."

This provision was amended by Public Acts 1987, No. 87-290, § 3.

(1) how the deductible of $100 provided by § 38-278 (1) (a) (ii) should be allocated to the claims for which UCC seeks reimbursement; and (2) what effect payments made by other insurance carriers in settlement of Bhopal claims should have pursuant to General Statutes § 38-282 (1)[3] in reducing the amount due UCC.

On appeal CIGA challenges the trial court's decision on the three issues resolved by the judgment and also seeks a ruling by this court upon the issues left undetermined. UCC has filed a cross appeal in which it seeks a remand directing the entry of judgment for the amount of its claim for reimbursement, $32,500,000 plus interest.

We affirm the judgment of the trial court on the first two issues ruled upon, vacate its declaration upon defense costs as premature, and remand the case for further proceedings with respect to the remaining issues. With respect to the cross appeal, we agree with the trial court that the relief sought by UCC would be inappropriate at this stage of the proceeding.

There is no dispute about the facts relied upon by the trial court in rendering judgment, which were taken largely from the affidavits filed in support of the motions for summary judgment. CIGA is a "nonprofit unincorporated legal entity" created by General Statutes § 38-276 and composed of all insurers licensed to transact business in this state that write any kind of direct insurance, except for those specifically excluded

[3] At the time of the loss, General Statutes § 38-282 (1) provided as follows: "(1) Any person having a claim against an insurer under any provision in an insurance policy, other than a policy of an insolvent insurer, which is also a covered claim under this chapter, shall exhaust first his rights under such policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under such insurance policy."
This provision was amended by Public Acts 1988, No. 88-76, § 3.

from the application of the Connecticut Insurance Guaranty Association Act by General Statutes § 38-274. UCC is a corporation organized under the laws of New York but having its principal place of business in Danbury. It was the owner of 50.9 percent of the common stock of Union Carbide of India, Ltd., which owned a chemical plant in Bhopal, India.

During the night of December 2–3, 1984, a release of toxic gas from the Bhopal plant killed approximately 2300 residents in the area, injured more than 200,000 other people, and also resulted in extensive damage to livestock and crops. Over 500,000 claims were asserted in India against UCC, alleging that it was responsible for the damages resulting from the release of gas from the Bhopal plant. Approximately 150 lawsuits were brought in the United States on behalf of 200,000 Indian claimants against UCC. All but three[4] of these actions were dismissed in favor of litigating the claims in India on the ground of forum non conveniens. In 1985 the government of India by an act of its parliament assumed the right to prosecute all claims arising out of the Bhopal incident. All the claims were consolidated into a single action against UCC in India seeking $3,000,000,000 in damages. In February, 1989, this action was settled by the payment of $420,000,000 on

[4] In *Connecticut Ins. Guaranty Assn.* v. *Raymark Corporation,* 215 Conn. 224, 575 A.2d 693 (1990), this court held that the failure to comply with the requirement of Practice Book § 390 (d) for notification or joinder of claimants against the insured in a declaratory judgment action seeking to determine CIGA's obligation for such claims under policies issued by an insolvent insurer was a jurisdictional defect invalidating the judgment rendered by the trial court. In the present case, however, it appears that the government of India has legislatively assumed control of all claims arising out of the Bhopal disaster and, as the representative of all such claimants, has accepted the amount paid by or on behalf of UCC in full settlement of those claims. We conclude, therefore, that it is unnecessary to notify the three claimants whose cases are still pending in this country of this declaratory judgment action.

behalf of UCC and $45,000,000 by Union Carbide of India, Ltd., to the Indian government.

At the time of the Bhopal disaster, UCC had a primary liability insurance policy of $500,000, a lead umbrella policy of $2,000,000, and excess insurance of $200,000,000 consisting of forty-two "excess umbrella" policies, providing total coverage of $202,500,000.[5] One hundred seventy million dollars has been paid on behalf of UCC by virtue of these policies, exhausting the limits of coverage provided by those insurers that are solvent. Three excess insurers,[6] however, whose policies provide for $32,500,000 of coverage, have become insolvent and UCC seeks now to be indemnified by CIGA for the failure of these insolvent companies to fulfill their policy obligations. Even if all its insurers had paid their full share of the settlement payment, UCC would still have paid $217,500,000 without reimbursement from insurance sources.

I

The principal issue in this case is whether the term "covered claims," for which General Statutes § 38-278 (1) (b)[7] requires CIGA to assume the obligations of the insolvent insurers, subject to a maximum for each such claim of $300,000 and a deductible of $100, refers to UCC's aggregate claim for reimbursement of $32,500,000 or to the separate claims of the

---

[5] These figures are taken from the memorandum of decision. CIGA and UCC in their briefs indicate that the total coverage was $204,000,000 allocated among various policies. This discrepancy is of no significance with respect to the issues raised in this appeal.

[6] These insurers are Transit Casualty Company, Midland Insurance Company and Integrity Insurance Company.

[7] At the time of the loss, General Statutes § 38-278 (1) (b) provided as follows: "Said association shall . . . (b) be deemed the insurer to the extent of its obligations on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent."

Bhopal victims that have been paid by UCC from noninsurance sources in the settlement with the government of India. The trial court held that "[t]he claims are the assertions of rights and demands for relief made by the claimants injured in the Bhopal disaster" and, accordingly, ruled that "[t]he $300,000 statutory limit is for each of the some 550,000 claims." We agree with this determination of the trial court.

CIGA maintains that a covered claim is the claim of an insured for indemnification under a liability policy, not the separate claims of tort victims that give rise to the claim for indemnification. It contends, therefore, that UCC's claim to be reimbursed for the single Bhopal occurrence under each of the six policies issued by the three insolvent insurers can constitute no more than six covered claims, each subject to the $300,000 maximum per claim of § 38-278 (1) (a). Under this analysis, CIGA's total obligation for the $32,500,000 of coverage provided by these insolvent insurers and applicable to the Bhopal incident could not exceed $1,800,000.

Section 38-275 (4), at the time of the loss in 1984, defined a "covered claim" to mean "an unpaid claim . . . which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this chapter applies issued by an insurer, if such insurer becomes an insolvent insurer after October 1, 1971, and (a) the claimant or insured is a resident of this state at the time of the insured event . . . ." It is not disputed that UCC qualifies as a resident of Connecticut and is both a "claimant" and an "insured." CIGA maintains that the clause "which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy" can refer only to the claim of an insured and not that of a tort victim against an insured, which arises out of wrongful conduct resulting in injury and is not limited by any

insurance policy. The claim of a tort victim, however, may be said to arise out of and be within the coverage and subject to the applicable limits of the policy so far as the insurer is concerned by virtue of General Statutes § 38-175,[8] which provides that "[e]ach insurance company which issues a policy to any person . . . insuring against loss or damage . . . for which . . . such person . . . is legally responsible, shall, whenever a loss occurs under such policy, become absolutely liable . . . ." This statute also permits an action directly against an insurer by a tort victim who has obtained a judgment against an insured that remains unsatisfied for thirty days. The Bhopal victims, therefore, upon the occurrence of their losses, apart from their causes of action against UCC, had claims against the insolvent insurers, that arose out of the policies issued to UCC and were subject to the terms of those policies.

---

[8] "[General Statutes] Sec. 38-175. LIABILITY OF INSURER UNDER LIABILITY POLICY. Each insurance company which issues a policy to any person, firm or corporation, insuring against loss or damage on account of the bodily injury or death by accident of any person, or damage to the property of any person, for which loss or damage such person, firm or corporation is legally responsible, shall, whenever a loss occurs under such policy, become absolutely liable, and the payment of such loss shall not depend upon the satisfaction by the assured of a final judgment against him for loss, damage or death occasioned by such casualty. No such contract of insurance shall be cancelled or annulled by any agreement between the insurance company and the assured after the assured has become responsible for such loss or damage, and any such cancellation or annulment shall be void. Upon the recovery of a final judgment against any person, firm or corporation by any person, including administrators or executors, for loss or damage on account of bodily injury or death or damage to property, if the defendant in such action was insured against such loss or damage at the time when the right of action arose and if such judgment is not satisfied within thirty days after the date when it was rendered, such judgment creditor shall be subrogated to all the rights of the defendant and shall have a right of action against the insurer to the same extent that the defendant in such action could have enforced his claim against such insurer had such defendant paid such judgment."

CIGA's argument that the definition of a "covered claim" in § 38-275 (4) encompasses only the claim of an insured is also refuted by the reference of the statute to "the claimant or insured," indicating that either a claimant or an insured resident of Connecticut might present a "covered claim." The 1987 amendment of the "covered claim" definition effectuated by Public Acts 1987, No. 87-290, § 1,[9] differentiated between a claim-

[9] Public Acts 1987, No. 87-290 § 1, provides in relevant part: "[(4)] (6) 'Covered claim' means an unpaid claim, including, but not limited to, one for unearned premiums, which arises out of and is within the coverage and [not in excess of] SUBJECT TO the applicable limits of an insurance policy to which this chapter applies issued by an insurer, if such insurer becomes an insolvent insurer after October 1, 1971, and (a) the claimant [or insured] is a resident of this state at the time of the insured event; or (b) THE CLAIMANT IS NOT A RESIDENT OF THIS STATE, BUT ONLY UNDER ALL OF THE FOLLOWING CONDITIONS: (i) THE INSURED IS A RESIDENT OF THIS STATE AT THE TIME OF THE INSURED EVENT; (ii) THE INSOLVENT INSURER IS LICENSED TO DO BUSINESS IN THIS STATE AT THE TIME OF THE INSURED EVENT; (iii) THE STATE OF THE CLAIMANT'S RESIDENCE HAS AN ASSOCIATION SIMILAR TO THE ASSOCIATION CREATED BY THIS CHAPTER; AND (iv) SUCH CLAIMANT IS REFUSED COVERAGE BY SUCH ASSOCIATION BECAUSE THE INSOLVENT INSURER IS NOT LICENSED TO DO BUSINESS IN THE STATE OF THE CLAIMANT'S RESIDENCE AT THE TIME OF THE INSURED EVENT; OR (c) the property from which the claim arises is permanently located in this state, provided the term 'covered claim' shall not include any amount due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise. A CLAIM SHALL NOT BE A 'COVERED CLAIM' IF IT IS FILED BY OR ON BEHALF OF AN INDIVIDUAL WHO IS NEITHER A CITIZEN OF THE UNITED STATES NOR AN ALIEN LEGALLY RESIDENT IN THE UNITED STATES AT THE TIME OF THE INSURED EVENT, OR AN ENTITY OTHER THAN AN INDIVIDUAL WHOSE PRINCIPAL PLACE OF BUSINESS IS NOT IN THE UNITED STATES AT THE TIME OF THE INSURED EVENT, AND IT ARISES OUT OF AN ACCIDENT, OCCURRENCE, OFFENSE, ACT, ERROR OR OMISSION THAT TAKES PLACE OUTSIDE OF THE UNITED STATES, OR A LOSS TO PROPERTY NORMALLY LOCATED OUTSIDE OF THE UNITED STATES OR, IF A WORKERS' COMPENSATION CLAIM, IT ARISES OUT OF EMPLOYMENT OUTSIDE OF THE UNITED STATES."

ant and an insured with respect to eligibility for asserting such a claim and expressly excluded those who are neither United States citizens nor aliens legally residing in this country from filing such a claim for accidents or losses occurring in other countries. The amendment, as well as its legislative history, indicate that the legislature regarded any person, whether a tort victim or an insured, as eligible to file a covered claim, but sought to exclude alien nonresidents, such as the Bhopal victims, from doing so after the effective date of the amendment, October 1, 1987.[10] A similar recognition of the right of either a claimant or an insured to present covered claims is contained in § 38-278 (1) (a) (ii), which establishes the $300,000 limit per claim and refers to CIGA's obligation "to any policyholder or claimant." General Statutes § 38-281 (1)[11] also alludes to "[e]very

---

[10] Representative Gabriel J. Biafore of the 125th District remarked as follows:

"Yes, Mr. Speaker. The bill itself, what it does . . . it is to reduce Connecticut's future explosion of claims from non-residents. Currently, if the insurance company is licensed in Connecticut and goes bankrupt, the Connecticut Guaranty Fund may be liable to claims all over the world.

"What this will do is just have us liable for Connecticut residents. Also, Mr. Speaker, for legislative intent, substitute Senate Bill 842 applies to claims filed with the Connecticut Insurance Guaranty Association after enactment of this bill. And the claims filed before enactment are governed by the present statute." 30 H.R. Proc., Pt. 22, 1987 Sess., pp. 8140–41.

[11] "[General Statutes] Sec. 38-281. ASSIGNMENT OF RIGHTS UNDER POLICY. RECEIVER OR LIQUIDATOR BOUND BY SETTLEMENTS. PRESERVATION OF RIGHTS OF ASSOCIATION. RIGHT OF RECOVERY. (1) Any person recovering any moneys under this chapter shall be deemed to have assigned his rights under the policy, in respect of which he is recovering, to said association to the extent of his recovery from said association. Every insured or claimant seeking the protection of this chapter shall cooperate with said association to the same extent as such person would have been required to cooperate with the insolvent insurer. Said association shall have no cause of action against any insured of the insolvent insurer for any sums it has paid out to such insured except such causes of action as the insolvent insurer would have had if such sums had been paid by the insolvent insurer. In the case of an insolvent insurer operating on a plan with assessment liability, payments of claims of said association shall not operate to reduce the liability of insureds to the receiver, liquidator, or statutory successor for unpaid assessments."

insured or claimant seeking the protection of this chapter," again implying that each claimant as well as each insured may present a "covered claim."

CIGA also argues that only one "covered claim" can arise out of an insolvent policy for each "occurrence" and that, because the Bhopal incident constituted a single occurrence, UCC can have only one "covered claim" for this occurrence, subject to the $300,000 limit. The statute, however, does not use the word "occurrence" and § 38-278 (1) (a) (ii) expressly applies the $300,000 limit to "claims," not occurrences. The six policies issued by the insolvent insurers contain limits per occurrence, but those limits total $32,500,000. There is no basis for substituting the word "occurrence" for the word "claim" in the provision of § 38-278 (1) (a) (ii) declaring that CIGA's obligation "shall include only that amount of each such claim which is in excess of one hundred dollars and is less than three hundred thousand dollars." The occurrence limitation of each policy does, of course, define the measure of CIGA's obligation under the policy for a particular occurrence, in accordance with the provision that "in no event shall said association be obligated . . . in an amount in excess of the obligation of the insolvent insurer." General Statutes § 38-278 (1) (a) (ii). The authorities cited by CIGA in support of its construction of § 38-278 (1) (a) (ii) do not hold to the contrary. *Arizona Property & Casualty Ins. Guaranty Fund* v. *Helme,* 153 Ariz. 129, 134, 735 P.2d 451 (1987); *Vickodil* v. *Pennsylvania Ins. Guaranty Assn.,* 356 Pa. Super. 325, 514 A.2d 635 (1986). In both these cases the courts properly recognized that the obligations of the guarantors were subject to the terms of the policies involved.

We also reject CIGA's factual contention that, because the six policies of the insolvent insurers indemnified UCC only for its "ultimate net loss," its right

of recourse to CIGA can constitute only one covered claim, subject to the statutory maximum of $300,000 per policy. The term "ultimate net loss" is defined in these policies to be "[t]he total sum which the insured . . . becomes legally obligated to pay as damages because of personal injury, property damage or advertising liability *claims* . . . as consequence of any occurrence covered hereunder . . . ." (Emphasis added.) This definition contemplates that multiple claims may arise from a single occurrence and is employed with a specific monetary limit in each policy to establish the maximum of the insurer's obligation under the policy. It does not require that UCC aggregate its claims for indemnification as a condition for presenting them to the insurer but simply delineates the insurer's maximum exposure from a single occurrence.

Similarly, we conclude that there is no merit in CIGA's position that, because the government of India assumed control of all the claims arising out of the Bhopal incident, which were consolidated into a single action, UCC's claim for indemnification arising therefrom constitutes only a single claim subject to the $300,000 maximum. The statute authorizing this assumption of control empowered the Indian government to *represent* the claimants for the purpose of efficiently resolving these claims. It did not purport to affect the substantive rights of the Bhopal victims to be compensated for their losses. Such a procedural device cannot be deemed to have diminished UCC's corresponding right to be indemnified by its insurance carriers, or their guarantor, CIGA, subject to the provisions of § 38-278.

Apart from our conclusion that the text of the act does not support the imposition of a $300,000 limit upon UCC's claim for indemnification under each of the six

policies whose insurers have become insolvent, we are also persuaded that the remedial purpose of this legislation would be largely defeated by such a restriction. Although this case involves a substantial indemnification claim of $32,500,000 presented by a large corporate enterprise, it is not exceptional today for individuals to carry liability insurance with limits far in excess of $300,000. The recovery of $300,000 by a single victim of an automobile accident is not extraordinary, and when there are multiple victims the total liability of the insured can readily exceed that amount. If we were to accept CIGA's argument that only an insured may present a covered claim and that such a claim for indemnification from a single occurrence is limited to $300,000, the protection of Connecticut residents against losses resulting from insolvency of insurance carriers, which the legislature intended to provide, would often prove illusory. Accordingly, we affirm the first and second conclusions of the trial court that the $300,000 limit of § 38-278 (1) (a) (ii) applies to each of the underlying claims of the Bhopal victims and that CIGA must pay the claims presented under the six policies of the insolvent carriers.

## II

The third issue on which the trial court rendered summary judgment involves UCC's expenditure of "$6,396,374.78 in legal services and other costs in the settlement of the claims," as stated by the court. In rendering judgment, the court declared simply that "CIGA must pay Carbide's costs of defense and settlement," relying upon the principle that an insured may recover the reasonable costs of defense as well as settlement when the carrier has wrongfully denied coverage and refused to defend a claim. *Alderman* v. *Hanover Ins. Group,* 169 Conn. 603, 611, 363 A.2d 1102

(1975); *Missionaries of the Company of Mary, Inc.* v. *Aetna Casualty & Surety Co.*, 155 Conn. 104, 114, 230 A.2d 21 (1967).

The evident basis for this determination is the provision of § 38-278 (1) (b) that CIGA shall "be deemed the insurer to the extent of its obligations on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." On appeal, CIGA does not contest the applicability of this provision generally to the expenses incurred by an insured in defending or settling a claim after a liability insurer has failed to fulfill its obligation to do so. To this part of the summary judgment it has raised as objections only the failure of the court to declare that (1) the $300,000 limit for each covered claim is applicable to UCC's total claim for defense costs, and (2) under the terms of the six excess policies of the three insolvent insurers in relation to the more primary coverage, no duty to defend was imposed on those companies or on CIGA.

The trial court did not address the issue of whether the $300,000 maximum per claim was applicable to UCC's claim for defense costs. No such issue, however, was expressly raised in the complaint, counterclaim, or cross motions for summary judgment filed by the parties. No motion has been made for further articulation of the decision pursuant to Practice Book § 4051. This court does not ordinarily consider issues not presented to or addressed by the trial court. Practice Book § 4185; *State* v. *Hinckley,* 198 Conn. 77, 81, 502 A.2d 388 (1985). There is no good reason to deviate from that policy in this case, because the issue can be determined properly in further proceedings on the remand that is necessary for reasons unrelated to this procedural flaw.

There appears to be a factual dispute that would preclude resolution of whether CIGA must indemnify UCC

for its defense costs under the terms of the six policies issued by the insolvent insurers. A policy issued by Royal Indemnity Company and affording coverage of $5,000,000 at the first layer of excess coverage contains an endorsement providing that "as of March 1, 1984 all expense costs shall be self-insured," a date approximately nine months before the Bhopal disaster. Although the policy limit for this coverage has been paid, CIGA claims that the obligations of the insolvent insurers that follow the Royal policy have similarly been restricted to exclude defense costs as a result of this endorsement. UCC, however, maintains that the Royal policy endorsement was ineffective because it was inconsistent with other provisions of the policy, thus creating an ambiguity to be resolved in favor of the insured. The trial court did not expressly consider this question, although it is mentioned in the memorandum of decision as one of the issues upon which CIGA sought a declaratory judgment. Again, neither party moved for articulation on the issue.

In any event, we conclude, as the trial court may possibly have decided, that the issue of ambiguity raised by UCC cannot be adequately resolved in a summary judgment proceeding. An essential condition for such a judgment is the absence of any material issue of fact. *Zichichi* v. *Middlesex Memorial Hospital,* 204 Conn. 399, 402, 528 A.2d 805 (1987). The question of possible ambiguity in the intentions of UCC and Royal with respect to the endorsement concerning defense costs can best be resolved after there has been evidence of the circumstances under which this change in the policy terms was made.

Although we do not fault the trial court for failing to consider the two issues concerning defense costs raised by CIGA on appeal, the court acted prematurely

in declaring unqualifiedly that "CIGA must pay Carbide's costs of defense and settlement." Those two issues must be resolved before such an order would be appropriate. Furthermore, it is not clear from the record whether the amount claimed for defense costs is reasonable and includes only those expenses related to the failure of the insolvent companies to fulfill their obligations. If the amount claimed represents all defense costs, the court should devise some reasonable method of allocating the share to be borne by CIGA. This question can be clarified on remand. Accordingly, the part of the declaratory judgment requiring CIGA to pay UCC's defense costs is vacated.

## III

The trial court refused to grant CIGA's various prayers for relief concerning the application of General Statutes § 38-282 (1) to the claims of the Bhopal victims, for which UCC seeks indemnification. Section 38-282 (1) imposes two conditions restricting CIGA's obligation to pay covered claims: (1) the claimant "shall exhaust first his rights under" a policy of insurance issued by a solvent insurer; and (2) "[a]ny amount payable on a covered claim . . . shall be reduced by the amount of any recovery under such insurance policy." With respect to the exhaustion requirement, the court apparently found no need to make the declaration requested in the complaint, because it is undisputed that UCC has exhausted its rights under the solvent policies by virtue of the payment of the full amount of coverage represented by those policies, $170,000,000[12]

[12] The memorandum of decision states that "some $164,000,000 has been paid by those solvent insurance companies which insured Carbide." CIGA in its brief declares that the solvent insurers have paid $170,000,000 to UCC. The UCC brief indicates that it has received $171,632,920 from its solvent insurers. We have used the $170,000,000 figure because, together with the $32,500,000 of coverage represented by the insolvent policies, the total coverage available to UCC was $202,500,000, as the trial court assumed. See footnote 5, supra.

as a contribution to the settlement of the Bhopal claims. On appeal, CIGA does not attack this determination.

A

Concerning the provision of § 38-282 (1) for reduction of covered claims by amounts recovered from other insurance policies, the trial court refused to make any declaration, because the record did not disclose "what reductions, if any, should be made in CIGA's obligations because of 'other insurance' available to the claimants or collateral benefits they may have received." In thus declining to resolve the issue until there was evidence of other insurance or benefits available to the claimants, the court implicitly rejected the claim of CIGA that the amount paid to or on behalf of UCC by its solvent insurers, $170,000,000, should effectuate a reduction that would entirely eliminate its obligations under the insolvent policies. CIGA pursues this claim on appeal, maintaining that the reduction for the insurance provided by the solvent insurers has wiped out its obligation for the $32,500,000 of coverage provided by the insolvent policies to pay covered claims arising out of the Bhopal incident.

We agree with the trial court's implicit rejection of CIGA's claim of entitlement to a reduction for other insurance on the basis of the present record. The evident purpose of providing in § 38-282 (1) for a reduction of a covered claim "by the amount of any recovery" from other available insurance was to prevent a person from twice receiving benefits for the same loss or otherwise obtaining a windfall, not to reduce the amount of a claim for a loss that remains partially unsatisfied. The corresponding provision of the model act, which uses virtually the same language, is entitled "Non-duplication of Recovery." NAIC State Post-Assessment Insurance Guaranty Association Model Bill. The different caption used by our legislature for

§ 38-282[13] does not indicate a different purpose from that contemplated by the framers of the model act, but is simply more descriptive of the mechanism used to prevent a double recovery. There is nothing in the record of this case to indicate that UCC had recourse to any other insurance from which to satisfy its claim for indemnification under the insolvent policies or that the Bhopal claimants had such recourse.

To construe § 38-282 (1) to allow CIGA to offset its obligation as guarantor of the insolvent policies by amounts paid by solvent insurers that fall short of satisfying a claim for indemnification would seriously undercut the protection that the legislature intended to provide. Such a result would penalize the prudent practice of dividing portions of the total liability coverage among different insurers, whether collateral or excess, in order to lessen the risk of insurer insolvency. CIGA's proposed interpretation effectively reduces the coverage afforded by the insolvent policies to the extent of coverage available under the solvent policies even though the loss remains partially unsatisfied. Thus, it

[13] "[General Statutes (Rev. to 1983)] Sec. 38-282. EXHAUSTION OF RIGHTS UNDER POLICY PRIOR TO CLAIM AGAINST ASSOCIATION. CLAIMS RECOVERABLE FROM MORE THAN ONE ASSOCIATION. (1) Any person having a claim against an insurer under any provision in an insurance policy, other than a policy of an insolvent insurer, which is also a covered claim under this chapter, shall exhaust first his rights under such policy. Any amount payable on a covered claim under this chapter shall be reduced by the amount of any recovery under such insurance policy.

"(2) Any person having a claim which may be recovered under more than one insurance guaranty association or its equivalent having a like function to that of said association shall seek recovery first from the association operating in the area of the residence of the insured except that if it is a first party claim for damage to property with a permanent location, such person shall seek recovery first from the association operating in the location of the property, and if it is a workers' compensation claim, he shall seek recovery first from the association operating in the area of the residence of the claimant. Any recovery under this chapter shall be reduced by the amount of recovery from any other insurance guaranty association or its equivalent having a like function to that of said association."

would encourage placing the entire amount of liability coverage with a single carrier in order to make CIGA's resources fully available in the event of insurer insolvency. In such a situation, the impact of the insolvency on CIGA would not be diminished by the availability of other solvent insurers to respond to a portion of the loss and would result in greater depletion of CIGA's resources.

We agree with those courts holding that statutory provisions similar to § 38-282 (1) were intended to apply only to prevent duplicate or windfall recoveries for losses sustained by an insured or a claimant resulting from insurer insolvency. In rejecting an argument similar to that raised by CIGA, the Supreme Court of Arizona declared: "In general, the legislative objective was to make the Fund liable to the same extent that the insolvent insurer would have been liable under its policy." *Arizona Property & Casualty Ins. Guaranty Fund* v. *Herder,* 156 Ariz. 203, 205, 751 P.2d 519 (1988). "We note at the outset that the statute does not provide for any offset or reduction in limits payable." (Emphasis omitted.) The Washington Court of Appeals has similarly stated that "the purpose of the exhaustion provision is to avoid duplication of recovery and prevent windfall judgments" in holding that a guaranty association "cannot offset payments by a primary insurer when it is standing in the shoes of an insolvent excess insurer." *Washington Ins. Guaranty Assn.* v. *McKinstry Co.,* 56 Wash. App. 545, 554, 784 P.2d 190 (1990). The cases relied upon by CIGA are clearly distinguishable.[14]

---

[14] CIGA relies upon *Palmer* v. *Montana Ins. Guaranty Assn.,* 779 P.2d 61 (Mont. 1989), which held that a tort victim whose damages exceeded $1,000,000 after the tortfeasor's carrier became insolvent, could not recover from the Montana Insurance Guaranty Association after having received a payment of $300,000 from the Idaho Insurance Guaranty Fund. The court relied upon a specific statutory provision that reduced the Montana association's obligation by the amount of recovery from any other guaranty associ-

## B

The trial court also refused to respond to CIGA's prayers for relief seeking a declaratory judgment that its obligation to pay covered claims should be reduced by any amount the Bhopal victims received or were eligible to receive for their claims from any insurance source other than the coverage insuring UCC, from any governmental source, or from any source whatsoever. The reasons given for this refusal were that none of the "non-insured claimants," as the court referred to them, or their putative insurers, which might have subrogation claims, had been joined in the action.

Both CIGA and UCC maintain that neither the Bhopal victims nor any insurers who have paid benefits to them are proper parties because, after the settlement of the victims' claims, they no longer had any interest in the amount UCC might recover by way of indemnification from CIGA. Although we agree that the settlement removed the need to afford the victims or their personal insurers, if any, an opportunity to enter the suit, we conclude for a different reason that it would have been inappropriate for the court to have addressed the issues raised in these prayers for relief. The present record does not disclose that any of the victims received payments from any other source but UCC, which paid the agreed settlement amount to the government of India as the victims' representative. In this factual vacuum it would have been improper for

---

ation or its equivalent. A similar provision is contained in General Statutes § 38-282 (2). UCC has had no recovery on its claim for indemnification based on the insolvent policies.

CIGA also cites *Blackwell* v. *Pennsylvania Ins. Guaranty Assn.*, 567 A.2d 1103 (Pa. Super. 1989), in which a recovery of $65,000 from uninsured motorist carriers was deducted from the sum otherwise payable by the Pennsylvania association, after the tortfeasor's liability carrier became insolvent. Again, UCC has received no payment on its claim for indemnification against its insolvent insurers.

the court to determine the issues proposed for adjudication. "[T]he declaratory judgment procedure may not be utilized merely to secure advice on the law . . . or to secure the construction of a statute if the effect of that construction will not affect a plaintiff's personal rights . . . ." *Horton* v. *Meskill,* 172 Conn. 615, 627, 376 A.2d 359 (1977). Until there is evidence of payments to the Bhopal victims from sources other than the settlement funds, the rendition of a declaratory judgment on the effect of such payments in reducing CIGA's obligation would violate these principles.

## IV

In its second prayer for relief, CIGA sought a declaration that the $100 deductible provision of § 38-278 (1) (a) (ii) be applied to each of the 500,000 claims of the Bhopal victims and thus effectuate a reduction of $50,000,000 in its obligation as guarantor of the insolvent policies. The trial court rejected this claim, holding that the provision applied only "to a claim processed and paid." Because the record did not disclose how much UCC had paid for the purpose of settling each of the 500,000 claims of the Bhopal victims individually for which it sought indemnification, however, the court refused to make any further determination of how the deductible amount should be applied against the aggregate sum of $32,500,000 of coverage represented by the insolvent policies.

We agree with the trial court that CIGA's simplistic approach of multiplying the total number of claims settled by $100 and deducting the product thus obtained from its total obligation under the insolvent policies is not sanctioned by § 38-278 (1) (a) (ii). That provision obligates CIGA to pay "only that amount of each [covered] claim which is in excess of one hundred dollars and is less than three hundred thousand dollars."

In seeking indemnification, UCC is in the same position as each Bhopal victim whose claim it has settled from its own funds. If these claims had been presented by the victims individually, CIGA's obligation would include only covered claims exceeding $100 and its payment of each such claim would reflect a deduction in this amount.

Without facts that would provide a basis for allocating the funds paid by UCC and by its solvent insurers among the 500,000 claims settled, it is impossible at this stage of the proceedings to decide upon the amount of the allowance to be made to CIGA by virtue of the $100 deductible clause. The trial court wisely did not attempt to make such a determination on the present record, which contains little of the information necessary. We agree with the court that resolution of this issue must await further proceedings.

V

In its cross appeal, UCC claims that the trial court should have rendered a judgment on its counterclaim for $32,500,000, the amount of coverage provided by the insolvent policies. No such monetary award was included, however, in UCC's prayers for relief, nor in its motion for summary judgment. This request for monetary relief was first made in UCC's reply trial brief.

The trial court decided that the issues left unresolved in rendering the declaratory judgment precluded an award of a specific sum of money at that stage of the proceedings, because the facts presented by the motions for summary judgment were insufficient. We agree with this conclusion and find no error on the cross appeal. Until the issues concerning defense costs, the availability of other insurance to the Bhopal victims and the applicability of the deductible clause have been fully

determined, the amount due UCC cannot be ascertained and no monetary award would be appropriate.

With respect to the appeal, the portion of the judgment requiring CIGA to pay UCC's defense costs is vacated and the case is remanded for further proceedings consistent with this opinion.

With respect to the cross appeal, the judgment is affirmed.

In this opinion the other justices concurred.