[No. B137765. Second Dist., Div. Four. Nov. 8, 2000.]

AMERICAN NATIONAL INSURANCE COMPANY, Plaintiff and Appellant, v.
HARRY W. LOW, as Insurance Commissioner, etc., Defendant and Respondent.

**Counsel**

Thelen, Reid & Priest, James J. Moak and Mark D. Campbell for Plaintiff and Appellant.

Rubinstein & Perry, Karl L. Rubinstein, Robert H. Nunnally, Jr., Kathleen M. McCain and David Wayne Johnson, Jr., for Defendant and Respondent.

Lord, Bissell & Brook, C. Guerry Collins and Stephen J. Tomasulo for California Insurance Guarantee Association as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**CURRY, J.**—This case involves the proper interpretation of the statutory provisions which prioritize claims among creditors of insolvent insurance companies, and govern the obligations of the California Insurance Guarantee Association (CIGA) to policyholders of insolvent member insurers. Under the Insurance Code, CIGA is obligated to pay an insolvent member insurer's "covered claims," which are defined, on the one hand, to include all obligations of the insurer arising from an insurance policy and, on the other, to exclude all obligations to insurers. (Ins. Code, § 1063.1, subd. (c).)[1] Section 1033, which contains the priority scheme for payment of claims by an insolvent insurer's estate, similarly excludes from priority obligations owed to insurers. The issue raised in this appeal is whether appellant American National Insurance Company, which is itself in the business of providing insurance to the public, can obtain priority for its claims as a policyholder after the insurer to which it looked for liability coverage became insolvent. Appellant maintains that as an insured seeking payment under the terms of a policy, its claims are entitled to policyholder priority. Respondent Insurance Commissioner and amicus curiae CIGA ask us to uphold a ruling by the trial court that relegated appellant to general creditor status. After review of the relevant statutes and their history, we conclude that the Legislature intended all policyholders' claims to fall within the category of "covered claims" even where the policyholders also happen to be in the business of providing insurance, and reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

Appellant filed an order to show cause why its claim against Mission Insurance Company (Mission), a liquidated insurer, should not have been allowed by the liquidator, respondent Insurance Commissioner. The following facts pertinent to appellant's claim were laid out in appellant's moving papers and are not disputed.

Appellant obtained an automobile liability insurance policy in the amount of $250,000 from Great American Insurance Company (Great American), which was issued effective January 1, 1980. Effective May 15 of that same year, Great American issued appellant a catastrophic liability insurance

---

[1] Unless otherwise specified, all statutory references herein are to the Insurance Code.

policy in the amount of $5 million. Mission issued an excess umbrella insurance policy in the amount of $10 million to appellant also effective May 15, 1980. Under the policy, Mission had the duty to indemnify appellant after the underlying insurer, Great American, had paid or been held liable to pay the full amount of its liability.

On May 15, 1980, Scott Duff, one of appellant's agents, struck Anthony Markese, a three-year-old boy, in an automobile/pedestrian accident, resulting in the boy becoming a quadriplegic. An action was brought on behalf of the child in Illinois, which resulted in a 1986 judgment against Duff and appellant in the amount of $6,591,344.

Great American tendered its policy limits (a total of $5.25 million under the automobile policy and the catastrophic liability policy) to Mission as the excess liability carrier. Mission had been declared insolvent and placed in conservatorship in California in 1985,[2] and was unable to accept the tender. Appellant thereafter settled with Markese at a cost of approximately $1 million over the amount received from the Great American policies. In addition, appellant filed a lawsuit against Great American in Texas alleging a failure to settle within policy limits, and received a settlement of $423,741 in June 1987.

In September 1987, appellant filed a proof of claim with the ancillary receiver for Mission in Texas. In October 1988, its claim was rejected as a covered claim as that term is defined under the provision of articles 21.28 and 21.28-C of the Texas Insurance Code,[3] but approved as a class 2 claim as defined by article 21.28, section 8 of the Texas Insurance Code[4] in the amount of $585,608.54. No funds were available to pay the claim. Thereafter, appellant filed a petition against the State of Texas in the Texas courts alleging that rejection of its claim as a covered claim was improper. The Texas Property and Casualty Insurance Guarantee Association (Texas Guarantee Association), the nonprofit unincorporated legal entity created pursuant to the Texas Insurance Code to pay covered claims, filed a plea in

---

[2]See *In re Mission Ins. Co.* (1995) 41 Cal.App.4th 828, 831 [48 Cal.Rptr.2d 209].

[3]Texas Insurance Code article 21.28-C, section 5(8) defines covered claim to mean "an unpaid claim of an insured or third-party liability claimant that arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this Act applies" where the "third-party claimant or liability claimant or insured is a resident of [Texas] at the time of the insured event, or the claim is a first-party claim for damage to property that is permanently located in [Texas]." Under the statute, the term "shall not include . . . any amount due any reinsured, insurer, insurance pool, or underwriting association, as subrogation recoveries, reinsurance recoveries, contribution, indemnification, or otherwise . . . ." (*Ibid.*)

[4]Texas Insurance Code article 21.28, section 8 defines class 2 claims to include "[a]ll claims by policyholders, beneficiaries, insureds, and liability claims against insureds covered under insurance policies and insurance contracts issued by the insurer."

intervention. In May 1996, judgment was entered in favor of appellant against the Texas Guarantee Association in the amount of $100,000.

In the meantime, appellant was notified by respondent of the proposed liquidation of Mission and filed a proof of claim in the amount of $1 million with respondent, the Mission liquidator and trustee of the Mission Insurance Company trust, in May 1987. In August 1998, it received notice by letter that respondent had rejected its claim. In respondent's letter, under "reason(s) for rejection," a box entitled "Claim paid in full by Guaranty Association" was checked. Beside it the word "settled" was handwritten in. Appellant filed its order to show cause contending its claim had not been satisfied by either the Texas Guarantee Association or by settlement. Respondent stated in its opposition that the rejection would be modified to a partial approval in the amount of $458,608.54,[5] but that appellant's claim would be assigned general creditor status rather than policyholder priority.

The trial court denied the order to show cause, giving the following rationale in its order: "When, as here, an insurance company purchases a simple liability insurance policy exactly the same as thousands of other policyholders, a logically sound argument can be made that they should not be differentiated in any manner. The legislature has, however, unequivocally differentiated the claims of an insurance company from those of all other policyholders, (Insurance Code sections 1033 & 1063.1) and relegated those claims to the lower priority (6). Although it can be argued that this constitutes a distinction without a difference, the classification is not irrational or arbitrary under the reasoning supporting the more explicit though substantially identical provision of the Model Act. It can also be argued that when an insurance company lays off its own direct risk by the purchase of a policy, as between two insurance companies, this is substantively a policy of reinsurance. Finally, policyholder status for [appellant] in these circumstances would set a dangerous precedent; an unwarranted camel's nose in the insolvency tent." An appeal was taken from this order.

DISCUSSION

I

The statutory provisions which we are called on to interpret are the versions of sections 1033 and 1063.1 in effect when appellant submitted its proof of claim. Section 1033 is contained in article 14 (div. 1, pt. 2, ch. 1) of

---

[5]We believe this is a clerical error and that respondent meant $485,608.54, the amount approved by the Texas Board of Insurance, less the $100,000 paid by the Texas Guarantee Association.

the code, which governs insolvency and delinquency of insurance companies. Section 1063.1 appears in article 14.2 of the same chapter, which created CIGA and dictates its powers and duties. ■ The purpose behind the creation of CIGA was to establish a fund from which insureds could obtain financial and legal assistance in the event their insurer became insolvent. (*Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 784 [244 Cal.Rptr. 655, 750 P.2d 297]; see § 1063 et seq.) All insurers transacting insurance business in California are involuntary members of CIGA unless exempted by the statute. (*Isaacson v. California Ins. Guarantee Assn., supra*, 44 Cal.3d at p. 784; see § 1063, subd. (a).) Members make premium payments to CIGA when a fellow insurer becomes insolvent. This enables CIGA to pay the obligation of the insolvent carrier. (§ 1063.5; *Burrow v. Pike* (1987) 190 Cal.App.3d 384, 398 [235 Cal.Rptr. 408].) Member insurers recoup their CIGA payments from their own policyholders through a surcharge on premiums. (§ 1063.14, subd. (a); *R. J. Reynolds Co. v. California Ins. Guarantee Assn.* (1991) 235 Cal.App.3d 595, 600 [1 Cal.Rptr.2d 405].) Appellant, as a provider of life insurance, is not a member of CIGA; Mission, as a liability insurer, was a member. (See § 1063, subd. (a).)

■ "CIGA's duties are not co-extensive with the duties owed by the insolvent insurer under its policy. [Citations.]" (*R. J. Reynolds Co. v. California Ins. Guarantee Assn., supra,* 235 Cal.App.3d at p. 601.) CIGA's primary function is to "pay and discharge *covered claims* and in connection therewith pay for or furnish loss adjustment services and defenses of claimants when required by policy provisions." (§ 1063.2, subd. (a), italics added.) CIGA is authorized by statute to "pay only . . . those [claims] determined by the Legislature to be in keeping with the goal of providing protection for the insured public. [Citation.]" (*R. J. Reynolds Co. v. California Ins. Guarantee Assn., supra,* at p. 600.)

" 'Since "covered claims" are not coextensive with an insolvent insurer's obligations under its policies, CIGA cannot and does not " 'stand in the shoes' of the insolvent insurer for all purposes." [Citation.] Indeed, CIGA is "expressly forbidden" to do so except where the claim at issue is a "covered claim." [Citation.] It necessarily follows that CIGA's first duty is to determine whether a claim placed before it is a "covered claim." ' [Citation.]" (*Industrial Indemnity Co. v. Workers' Comp. Appeals Bd.* (1997) 60 Cal.App.4th 548, 557 [70 Cal.Rptr.2d 295], quoting *Saylin v. California Ins. Guarantee Assn.* (1986) 179 Cal.App.3d 256, 262 [224 Cal.Rptr. 493].)

Section 1063.1, subdivision (c)(1) contains the general definition of covered claims, and defines the term as follows: "[T]he obligations of an

insolvent insurer, including the obligation for unearned premiums, (i) imposed by law and within the coverage of an insurance policy of the insolvent insurer . . . ."[6] (§ 1063.1, subd. (c)(1).)

Section 1063.1, subdivision (c) goes on to list numerous categories of obligations owed by the insolvent insurer which are to be excluded from claims payable by CIGA. At the time of the Mission liquidation and appellant's submission of a proof of claim, section 1063.1, subdivision (c)(4), provided: " 'Covered claims' shall not include any obligations to insurers, insurance pools, or underwriting associations, except as otherwise provided in this chapter." (Stats. 1969, ch. 1347, § 3, p. 2701.)

At the time covered by the Mission liquidation and appellant's proof of claim, section 1033, subdivision (a), provided that "[a]ll claims of [CIGA] and associations or entities performing a similar function in other states, together with claims for refund of unearned premiums and all claims of policyholders of an insolvent insurer that are not covered claims" would be accorded category 5 priority, behind "[e]xpense of administration," "[u]npaid charges due under the provisions of Section 736 [for examinations conducted by the Department of Insurance]," "[t]axes due to the State of California," and "Claims having preference by the laws of the United States and by laws of this state," but ahead of general creditors. (Stats. 1979, ch. 384, § 1, p. 1445.) Specifically excluded from category 5 priority were "[c]laims excluded by paragraphs (3) (except claims for refund of unearned premiums), *(4)*, (5), (7), and (8) *of subdivision (c) of Section 1063.1* and subdivisions (g) and (h) of Section 1063.2 shall be excluded from this priority." (*Ibid.*, italics added.)

We begin our analysis with a brief review of the evolution of these statutes over the years.

## II

### A. *Section 1063.1*

The general definition of "covered claims" contained in section 1063.1, subdivision (c)(1) was part of the CIGA statute when it was enacted in 1969

---

[6]The statute goes on to state additional requirements which must be met before the claim will be covered. The claim must be "unpaid by the insolvent insurer"; it must have been "presented as a claim to the liquidator in this state or to the association on or before the last date fixed for the filing of claims" in the liquidation proceeding; it must have been incurred "prior to the date coverage under the policy terminated" and "prior to, on, or within 30 days after the date the liquidator was appointed"; the "assets of the insolvent insurer are insufficient to discharge in full"; and, in the case of insurance other than workers' compensation, either the third party claimant or the insured must be a resident of California at the time of the insured occurrence, unless the property from which the claim arose was permanently located in this state. (§ 1063.1, subd. (c)(1).)

(see Stats. 1969, ch. 1347, § 3, pp. 2700-2701), and has not changed greatly since that time. The original statute defined covered claims to mean "the obligations of an insolvent insurer, (i) imposed by law and arising out of an insurance policy of the insolvent insurer . . . ." (*Id.* at p. 2700.)

As originally enacted, section 1063.1 provided in subdivision (c)(4): " 'Covered claims' shall not include any obligations to insurers, insurance pools, or underwriting associations, except as otherwise provided in this chapter." (Stats. 1969, ch. 1347, § 3, p. 2701.) This was the language in effect when the Mission liquidation began and appellant submitted its proof of claim.

In 1987, the provisions governing CIGA were amended in various respects. One of these amendments added the language which is found in the current version of the statute: " 'Covered claims' shall not include any obligations to insurers, insurance pools, or underwriting associations, *nor their claims for contribution, indemnity, or subrogation, equitable or otherwise,* except as otherwise provided in this chapter." (Stats. 1987, ch. 833, § 1, p. 2662, italics added.) That exclusion is now contained in section 1063.1, subdivision (c)(5) of the most recently amended statute. The parties agree that we should concentrate on the pre-1987 version as the one in effect at all relevant times.[7]

B. *Section 1033*

Unlike the CIGA provisions which are of fairly recent origin, the provisions governing priority of claims among an insolvent insurer's unpaid creditors date back to the early 1900's. (See Stats. 1919, ch. 178, p. 265.) In the early years, preferences accorded to an insolvent insurer's creditors were simple and straightforward: "1. expense of administration; 2. claims having preference by the laws of the United States and by the laws of this State; 3. all other claims." (Stats. 1933, ch. 534, § 8d, p. 1422; Stats. 1935, ch. 145, § 1033, p. 545.) Other preference categories were added before very long— the costs of examinations conducted by the Department of Insurance under section 736 and taxes due to the State of California. (See Stats. 1937, ch. 932, § 4, p. 2564; Stats. 1939, ch. 934, § 3, p. 2632.) In 1970, following the creation of CIGA in 1969, a separate preference category was created for "[a]ll claims of [CIGA] together with claims for refund of unearned premiums," and given priority 5 status—behind the other specific categories, but ahead of "[a]ll other claims." (Stats. 1970, ch. 1205, § 1.5, p. 2116.)

In 1979, section 1033 was amended to include reference to section 1063.1 to make clear that the following types of claims were excluded from the

---

[7]Because the pertinent language was contained in subdivision (c)(4) during the relevant period, that is how we will refer to it here.

priority 5 category: "Claims excluded by paragraphs (3) (except claims for refund of unearned premiums), (4), (5), (7), and (8) of subdivision (c) of Section 1063.1 . . . ."[8] (Stats. 1979, ch. 384, § 1, p. 1445.) The addition of that language was necessitated by another change made in 1979. The Legislature had also added the following new language to the category of claims given priority 5 status: "All claims of the [CIGA] and associations or entities performing a similar function in other states, together with claims for refund of unearned premiums *and all claims of policyholders of an insolvent insurer that are not covered claims.*" (*Ibid.*, italics added.) In other words, claims under a policy which did not meet the precise definition of "covered claims" were nonetheless entitled to priority equal to CIGA's unless they were also claims excluded by paragraphs (3), (4), (5), (7), and (8) of subdivision (c) of section 1063.1.

The next significant amendment to section 1033 occurred in 1995 when the phrase "under insurance and annuity policies or contracts, including funding agreements" was substituted for "of policyholders" so that the last part of the relevant provision now reads: "and all claims *under insurance and annuity policies or contracts, including funding agreements,* of an insolvent insurer that are not covered claims." (§ 1033, subd. (a)(2), italics added; Legis. Counsel's Dig., Assem. Bill No. 1328 (1995-1996 Reg. Sess.), Stats. 1995, ch. 795, § 2.)

Finally, in 1997, long after the Mission liquidation, CIGA and others in the priority 5 category were moved up to priority 2, right after expenses of administration and above unpaid taxes and other charges. The 1997 amendment to section 1033 also abandoned the cross-reference to section 1063.1 in favor of expressly listing the applicable exclusions. Subdivision (a)(2)(B) of section 1033 currently provides in part: "The following claims are excluded from this priority: [¶] . . . [¶] (B) Any obligations to insurers, insurance pools, or underwriting associations, and their claims for contribution, indemnity, or subrogation, equitable or otherwise, except as otherwise provided in this chapter." Again, the parties agree that we should focus on the older version in effect when appellant submitted its proof of claim.

### III

■ Construction of a statute is a question of law which appellate courts review de novo. (*City of Petaluma v. County of Sonoma* (1993) 12 Cal.App.4th 1239, 1244 [15 Cal.Rptr.2d 617].) Proper interpretation starts

---

[8]As we have seen, at the time of the 1979 amendment, the provision concerning obligations owed to insurance companies was found in subdivision (c)(4) of section 1063.1. (Stats. 1979, ch. 384, § 3, p. 1447.)

with the actual language of the statute. "[I]t is the language of the statute itself that has successfully braved the legislative gauntlet. It is that language which has been lobbied for, lobbied against, studied, proposed, drafted, restudied, redrafted, voted on in committee, amended, reamended, analyzed, reanalyzed, voted on by two houses of the Legislature, sent to a conference committee, and, after perhaps more lobbying, debate and analysis, finally signed 'into law' by the Governor." (*Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238 [8 Cal.Rptr.2d 298].) "In examining the language, the courts should give to the words of the statute their ordinary, everyday meaning [citations] unless, of course, the statute itself specifically defines those words to give them a special meaning [citations]." (*Id.* at pp. 1238-1239.)

If, after review of the language itself, the meaning is without ambiguity, doubt, or uncertainty, "then the language controls. [Citations.]" (*Halbert's Lumber, Inc. v. Lucky Stores, Inc., supra*, 6 Cal.App.4th at p. 1239.) "There is nothing to 'interpret' or 'construe.' [Citations.]" (*Ibid.*)

If the meaning is not clear, courts may take the next step and refer to the legislative history. (*Halbert's Lumber, Inc. v. Lucky Stores, Inc., supra*, 6 Cal.App.4th at p. 1239.) The final step is to apply "reason, practicality, and common sense to the language [of the statute]," interpreting the words in such a way as to make them "workable and reasonable"; "in accord with common sense and justice"; and "to avoid an absurd result [citations]." (*Id.* at pp. 1239-1240.) ■ The "contemporaneous construction of a new enactment by the administrative agency charged with its enforcement, although not controlling, is entitled to great weight," but final interpretation of a statute is a question of law which rests with the court. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1388 [241 Cal.Rptr. 67, 743 P.2d 1323].)

■ Respondent and amicus curiae CIGA both insist that we need not look beyond the plain language of the statute and that there is nothing to interpret or construe. As they see it, in assigning priority, former section 1033 instructs us to apply the exclusions contained in former subdivision (c)(4) of section 1063.1. Former subdivision (c)(4) said that "any obligations to insurers" were to be excluded from coverage. The obligation under the Mission umbrella insurance policy is owed to appellant, an insurer. Therefore, the obligation was properly excluded from priority. We could go along with this analysis only if, like respondent and amicus curiae, we were willing to focus on a narrow segment of former section 1063.1 and overlook the remainder of the statute. ■ "The meaning of a statute may not be determined from a single word or sentence; the words must be construed in

context, and provisions relating to the same subject matter must be harmonized to the extent possible. . . . An interpretation that renders related provisions nugatory must be avoided." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) Where two provisions of a statute appear to be in conflict, the legislation should be construed, wherever possible, so as to harmonize its various elements and to reconcile the potentially conflicting provisions. (*Russell v. Stanford University Hospital* (1997) 15 Cal.4th 783, 789 [64 Cal.Rptr.2d 97, 937 P.2d 640].) It is only where apparently conflicting provisions cannot be harmonized that the provision which is found later in the statute or which is more specific controls the earlier or more general provision. (*Ibid.*; *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 478 [66 Cal.Rptr.2d 319, 940 P.2d 906].)

 Section 1063.1, subdivision (c)(1) plainly states that covered claims include the obligations within the coverage of an insurance policy issued by the insolvent insurer. The meaning of subdivision (c)(1) is clear—all policyholder claims are covered. Former subdivision (c)(4) provides: " 'Covered claims' shall not include any obligations to insurers, insurance pools, or underwriting associations *except as otherwise provided in this chapter.*" (Stats. 1969, ch. 1347, § 3, p. 2701, italics added.) The meaning attributed to subdivision (c)(4) by respondent and amicus curiae—no insurer claims are covered—is unambiguous only if we disregard the last phrase which could be read to refer back to subdivision (c)(1). We believe that the two provisions must be harmonized where the insurer is also a policyholder. Looking at the terms used in the entire legislation rather than focusing on one phrase in isolation, we believe the statute: (1) creates a general category of covered claims—claims made under an insurance policy; (2) creates an exclusion to the category—claims made by insurers in their role as insurers; and (3) creates an exception to the exception—claims held by insurers who are also policyholders.

We are persuaded in our view by some of the very factors raised by respondent and amicus curiae. First, they refer to the Model Act of the Post-Assessment Property and Liability Insurance Guaranty Association (Model Act), which contains the following exclusionary provision: " 'Covered claim' shall not include any amount . . . due any reinsurer, insurer, insurance pool, or underwriting association as subrogation recoveries or otherwise." (Model Act (Jan. 1987) § 5, p. 540-3.)

We agree that the language of the Model Act, on its face, seems to call for an absolute prohibition on recoveries by insurers such as appellant. It states that amounts due insurers whether as subrogation recoveries *or otherwise* are to be excluded from coverage. As respondent concedes, however, the language cited is found in the 1987 revisions to the Model Act. The relevant

language of section 1063.1 goes back to at least 1969. We cannot overlook the obvious point that our Legislature did not adopt the version urged by the drafters of the Model Act. Our version does not plainly state that both subrogation and other types of claims by insurers are to be barred. Moreover, the California statute provides that covered claims shall not include obligations to insurers "except as otherwise provided in this chapter." The Model Act contains no such exception referring back to other provisions.[9]

Although the Legislature amended the provision in 1987, section 1063.1 was not amended to conform to the Model Act.[10] The Legislature added reference to specific types of contribution, indemnity, or subrogation obligations owed to insurers but did not use the "or otherwise" language as the Model Act does to clearly state an intention that all types of claims by an insurer are to be excluded. Section 1063.1, subdivision (c)(5) now states: " 'Covered claims' does not include any obligations to insurers, insurance pools, or underwriting associations, nor their claims for contribution, indemnity, or subrogation, *equitable or otherwise*, except as otherwise provided in this chapter."[11] (Italics added.) The phrase "or otherwise" is not used in the same sense as in the Model Act. Unlike in the Model Act, the phrase "or otherwise" is used to make clear that all types of claims for contribution, indemnity, or subrogation, equitable or nonequitable, are excluded. Significantly, the phrase "except as otherwise provided in this chapter" was not deleted by the amendment.

Respondent and amicus curiae attempt to persuade us that the public policy behind the CIGA provisions supports their view. CIGA focuses on the

---

[9]The same difficulty arises were we to attempt to base a decision on the reasoning of courts from other jurisdictions, many of which have adopted the Model Act version verbatim or nearly so.

[10]Although the opinions of a later Legislature are not dispositive of the intent of the Legislature in session when the statute was enacted, it is interesting to note that (1) the analysis of the 1987 amendments prepared for the Senate Committee on Insurance, Claims, and Corporations, (2) the consent analysis prepared by the Senate Rules Committee on Office of Senate Floor Analyses, and (3) the concurrence prepared by the Office of Assembly Floor Analyses all conveyed the message that only to the extent insurers' claims were for contributions, indemnity, or subrogation would they be precluded. Each of these analysts agreed that: "A covered claim does not include an insurers', insurance pools', or underwriting associations' claims for contributions, indemnity, or subrogation." (Sen. Com. on Insurance, Claims and Corporations, analysis of Assem. Bill No. 1771 (1987-1988 Reg. Sess.) as amended June 30, 1987, p. 1; Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 1771 (1987-1988 Reg. Sess.) as amended Aug. 27, 1987, p. 2. Off. of Sen. Floor Analyses, conc. in Sen. Amends. of Sen. Bill No. 1771 (1987-1988 Reg. Sess.) as amended Aug. 27, 1987, p. 2.)

[11]The current version of section 1033 contains the same language. Excluded from priority are "[a]ny obligations to insurers, insurance pools, or underwriting associations, and their claims for contribution, indemnity, or subrogation, equitable or otherwise, except as otherwise provided in this chapter." (§ 1033, subd. (a)(2)(B).)

need to keep the number of covered claims limited to assure its financial stability and reduce the charges levied on member companies and consumers. The argument that CIGA's financial stability is preeminent could be used to oppose any recovery under the statute, and taken to the extreme would result in no claims being covered. We see the primary policy behind the creation of CIGA to ensure that those who have purchased insurance, paid premiums over the years, and counted on its existence to prevent financial calamity, are not left high and dry when their insurer goes under. As CIGA itself points out, "the costs of CIGA coverage are passed along to the public in the form of a surcharge on premiums paid by every buyer of insurance in California." Like every other buyer of insurance, appellant paid its share of the cost of the system. We see no reason its claims under its policy with an insolvent insurer should be excluded from coverage provided it can otherwise meet the statutory requirements and is not seeking recovery in its status as an insurer.

Respondent contends that CIGA was set up to protect individual policyholders "who, unlike insurers, have little means of analyzing the risks involved and financial condition of insurance companies with which they do business." In support, respondent cites comments to the 1987 Model Act in which the drafters stated: "The subcommittee does not feel that coverage should be extended to elements of the insurance industry which know or reasonably can be expected to know the financial conditions of various companies." (Model Act, *supra*, com. on § 5, p. 450-3.) We do not see any reason to expect a life insurance company from Texas to have insight into the financial stability of a California liability insurance carrier, and we see no evidence that the Legislature agreed with the Model Act in this regard. Not only did the Legislature pass its own version of the language, which did not exclude from coverage all claims made by insurers "as subrogation recoveries *or otherwise*" (Model Act, *supra*, § 5, p. 450-3, italics added), it also rejected another novel provision of the 1987 act which has bearing on our analysis. The drafters of the Model Act sought to allow the various state guaranty associations to recover reimbursement for any amounts paid to or on behalf of "any insured whose net worth . . . exceeds $50 million." (*Id.* § 11, p. 450-11.) The California Legislature rejected that approach for limiting CIGA coverage to nonwealthy individuals and small companies. No such language appears in the Insurance Code. To the contrary, the definition for claimant added by the Legislature in 1987 broadly applies to "any insured making a first party claim or any person instituting a liability claim" excluding only persons who are "an affiliate of the insolvent insurer . . . ." (§ 1063.1, subd. (g); Stats. 1987, ch. 833, § 1, p. 2663.)

In sum, we do not see why an entity that was not excluded from paying its share of the costs of CIGA as if it were an ordinary consumer of insurance,

should find itself left behind when its insurer becomes insolvent. Although this particular claim is no doubt within appellant's financial capacity to handle, the same could not necessarily be said if, for example, it had been faced with the insolvency of Great American Insurance Company and the loss of $5.25 million. Nothing in our record reveals appellant's net worth or its capacity for handling uninsured liabilities of this type. We can easily imagine situations where the result recommended by respondent and amicus curiae would cause financial difficulty in an otherwise sound insurer, and lead to the very evil the statutes were designed to alleviate. We agree with appellant that when an insurer appears before respondent as a policyholder making an original claim under an insurance policy in its own name, it should not be treated like an insurer making a claim for subrogation, contribution, or indemnity.

## DISPOSITION

The trial court's order of October 19, 1999, is reversed. The matter is remanded for determination of appellant's proper priority status as a policyholder. Costs on appeal are awarded to appellant.

Vogel (C. S.), P. J., and Epstein, J., concurred.