[No. B134895. Second Dist., Div. One. Nov. 27, 2000.]

CD INVESTMENT COMPANY et al., Plaintiffs and Appellants, v. CALIFORNIA INSURANCE GUARANTEE ASSOCIATION, Defendant and Respondent.

1412

1414

**COUNSEL**

Zemanek & Mills, John D. Zemanek and Stephan A. Mills for Plaintiffs and Appellants.

Black, Compean & Hall, Frederick G. Hall and Daniel Eli for Defendant and Respondent.

**OPINION**

**MALLANO, J.**—In prior litigation, a money judgment was entered against the plaintiffs in this action. To pay the judgment, plaintiffs looked to their insurers, two of which had become insolvent. With respect to those two, plaintiffs sought recovery from the California Insurance Guarantee Association (CIGA), which is required by statute to pay a "covered claim" on behalf of an insolvent insurer, up to a maximum of $500,000. CIGA refused to make any payments, and this action followed.

CIGA contends that there is no "covered claim" because the payments made by the *solvent* insurers ($1.5 million) exceed its $500,000 cap. We hold that, under the CIGA statutes, the insureds have a "covered claim" under each of the five successive policies issued by the insolvent insurers and that CIGA's statutory cap applies separately to each policy. We also hold that the payments by the solvent insurers do not offset the amount CIGA is obligated to pay under the policies of the insolvent insurers.

BACKGROUND

In 1982, CD Investment Company designed and built a three-story parking garage for the City of Anaheim. In August 1988, Anaheim filed an action against CD Investment, alleging property damage caused by alleged defects in the design and construction of the garage (*City of Anaheim v. Ertzan* (Super. Ct. San Bernardino County, 1988, No. 246402). Also named as defendants were CD III, Lazben Anaheim Company, Naftali Deutsch, and Overland Plumbing, Inc. (We refer to these parties collectively as CD Investment throughout this opinion.)

The case was tried before a jury in late 1991 and early 1992. The jury returned a verdict in favor of Anaheim and awarded $4,027,000 in damages. On September 2, 1992, the trial court entered judgment on the verdict and awarded Anaheim $92,036.62 in costs. CD Investment appealed.

In December 1994, while the appeal was pending, Anaheim and CD Investment settled the case. Three of CD Investment's insurers (Fireman's Fund Insurance Company, Northern Insurance Company, and Aetna Insurance Company) each paid $500,000 toward the settlement. CD Investment contributed $875,000 of its own funds and incurred an additional $87,858.94 in costs and attorneys' fees.

Meanwhile, on or about February 24, 1987, two of CD Investment's insurers—Mission National Insurance Company and Enterprise Insurance Company—became insolvent and were subject to ongoing insolvency proceedings under the Insurance Code (Ins. Code, §§ 1010-1062). A liquidator was duly appointed to wind up the business of both insurers.

CD Investment had a total of five policies from the insolvent insurers: Mission National provided coverage for one year, and Enterprise subsequently issued policies covering three and one-half years. According to CD Investment, the policies covered five successive periods, from July 29, 1981, to January 1, 1986.

In the insolvency proceedings, CD Investment asserted a separate claim as to each of the five policies, alleging that (1) each claim had arisen before the

applicable insurance policy had terminated and before the liquidator was appointed, (2) none of the claims had been paid, (3) the claims were not covered by any other insurance, (4) CD Investment was a resident of California at the time of the insured occurrence under each policy, (5) the assets of the insolvent insurers would not be sufficient to discharge the claims in full, (6) the obligations of the insolvent insurers arose under their respective insurance policies while they were authorized to transact business in California, (7) liability on the claims was imposed by law and came within the coverage of the policies, and (8) the jury did not award punitive damages in the underlying case.

CD Investment demanded that CIGA honor the obligations of the insolvent insurers by reimbursing it for approximately $963,000 in out-of-pocket expenses: the $875,000 settlement payment and $87,858.94 in costs and attorneys' fees. CIGA denied the claims on the ground that the solvent insurers had already paid $1.5 million, which exceeded CIGA's $500,000 cap.

On November 30, 1998, CD Investment filed this action against CIGA, seeking reimbursement for its out-of-pocket expenses. CD Investment alleged that CIGA's statutory cap applied separately to each of the five policies (resulting in $2.5 million of coverage) and that CIGA was obligated to make payment under those policies.

On May 28, 1999, CIGA filed a motion for judgment on the pleadings. CD Investment filed opposition. The trial court granted the motion and entered judgment in CIGA's favor. CD Investment filed a timely appeal.

### DISCUSSION

"A motion for judgment on the pleadings is analogous to a general demurrer. . . . The task of this court is to determine whether the complaint states a cause of action. All facts alleged in the complaint are deemed admitted, and we give the complaint a reasonable interpretation by reading it as a whole and all of its parts in their context. . . . We are not concerned with a plaintiff's possible inability to prove the claims made in the complaint, the allegations of which are accepted as true and liberally construed with a view toward attaining substantial justice. . . . [¶] . . . '[W]e are not bound by the determination of the trial court, but are required to render our independent judgment on whether a cause of action has been stated.' " (*Lance Camper Manufacturing Corp. v. Republic Indemnity Co.* (1996) 44 Cal.App.4th 194, 198 [51 Cal.Rptr.2d 622], citations omitted.)

" 'The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose

1418

of the law. . . .' . . . In determining that intent, we first examine the words of the statute itself. . . . Under the so-called 'plain meaning' rule, courts seek to give the words employed by the Legislature their usual and ordinary meaning. . . . However, the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose. . . . If the terms of the statute provide no definitive answer, then courts may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history." (*Bodell Construction Co. v. Trustees of Cal. State University* (1998) 62 Cal.App.4th 1508, 1515-1516 [73 Cal.Rptr.2d 450], citations omitted.)

█ In this case, we also keep in mind that "[t]he legislative intent [for creating CIGA] was to [ensure] protection for the public against insolvent insurers when no secondary insurer is available. . . . [¶] . . . [¶] . . . A remedial or protective statute should be liberally construed to promote the underlying public policy . . . ." (*Bunner v. Imperial Ins. Co.* (1986) 181 Cal.App.3d 14, 20-21 [225 Cal.Rptr. 912], citations omitted.) █ And, although CIGA's interpretation of a statute may be entitled to great weight, the ultimate responsibility for the interpretation of the law rests with the courts. (*Id.* at p. 22.)

A. *Purpose of CIGA*

█ "CIGA was created in 1969 as a compulsory association of state-regulated insurance companies. . . . Its purpose is 'to provide insurance against loss arising from the failure of an insolvent insurer to discharge its obligations under its insurance policies.' . . . CIGA assesses its members when another member becomes insolvent, thereby establishing a fund from which insureds whose insurers become insolvent can obtain financial and legal assistance. . . . Member insurers then recoup assessments paid to CIGA by means of a surcharge on premiums to their policy holders. . . . In this way the insolvency of one insurer does not impact a small segment of insurance consumers, but is spread throughout the insurance consuming public, which in effect subsidizes CIGA's continued operation.

"While CIGA's general purpose is to pay the obligations of an insolvent insurer, it is not itself an insurer . . . . 'CIGA is *not* in the "business" of insurance . . . . CIGA issues no policies, collects no premiums, makes no profits, and assumes no contractual obligations to the insureds.' . . . Rather it is authorized by statute to pay only 'covered claims' of an insolvent insurer, those determined by the Legislature to be in keeping with the goal of providing protection for the insured public. . . . [¶] . . . CIGA is an insurer

of last resort and does not assume responsibility for claims where there is any other insurance available." (*R. J. Reynolds Co. v. California Ins. Guarantee Assn.* (1991) 235 Cal.App.3d 595, 599-600 [1 Cal.Rptr.2d 405], citations omitted.)

In general, the CIGA statutes cover workers' compensation, automobile, and other lines of property and casualty insurance. (Ins. Code, § 1063, subd. (a).) They do not apply to (1) life, annuity, health, or disability insurance, (2) mortgage guaranty, financial guaranty, or other forms of insurance offering protection against investment risks, (3) fidelity or surety insurance including fidelity or surety bonds, or any other bonding obligations, (4) credit insurance, (5) title insurance, (6) ocean marine insurance or ocean marine coverage under any insurance policy, or (7) any claims servicing agreement or insurance policy providing for certain kinds of retroactive coverage. (*Ibid.*; see *id.*, § 1063.1, subd. (c)(3)(i)-(vii).) (All further statutory references are to the Insurance Code unless otherwise indicated.)

B. *Statutory Obligations of CIGA*

Turning to the applicable statutes, CIGA "shall pay and discharge covered claims and in connection therewith pay for or furnish loss adjustment services and defenses of claimants when required by [insurance] policy provisions." (§ 1063.2, subd. (a).) " 'Claimant' means any insured making a first party claim or any person instituting a liability claim . . . ." (§ 1063.1, subd. (g).) "Covered claims" is defined broadly as "the obligations of an insolvent insurer . . . imposed by law and within the coverage of an insurance policy of the insolvent insurer . . . which were unpaid by the insolvent insurer . . . ." (*Id.*, subd. (c)(1).)

This is not to say that CIGA assumes all of the obligations of an insolvent insurer. " '[C]overed claims' are not coextensive with an insolvent insurer's obligations under its policies[.] CIGA cannot and does not ' "stand in the shoes" of the insolvent insurer for all purposes.' . . . Indeed, CIGA is 'expressly forbidden' to do so except where the claim at issue is a 'covered claim.' " (*Saylin v. California Ins. Guarantee Assn.* (1986) 179 Cal.App.3d 256, 262 [224 Cal.Rptr. 493].) The statutory scheme lists 10 types of obligations that are not "covered claims." (§ 1063.1, subd. (c)(3)-(12).)

In applying the pertinent statutes, we must decide whether CD Investment is a "claimant" asserting "covered claims" that do not fall within any of the 10 excluded categories.

### 1. *Claimant*

██ The first issue is straightforward. CD Investment is a "claimant" because it is either an "insured making a first party claim or [a] person instituting a liability claim . . . ." (§ 1063.1, subd. (g); see *Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 789-795 [244 Cal.Rptr. 655, 750 P.2d 297] [insured may be entitled to reimbursement from CIGA where CIGA fails to contribute to reasonable settlement of underlying case]; see also *Nowlon v. Koram Ins. Center, Inc.* (1991) 1 Cal.App.4th 1437, 1443-1444 [2 Cal.Rptr.2d 683] [for purposes of CIGA, "claimant" applies to first and third party claims]; *Warner v. Fire Ins. Exchange* (1991) 230 Cal.App.3d 1029, 1032-1034 [281 Cal.Rptr. 635] [discussing first and third party claims].)

### 2. *Covered Claims*

We now consider whether CD Investment has asserted "covered claims" as that term is broadly defined in the statute: "the obligations of an insolvent insurer . . . ." (§ 1063.1, subd. (c)(1).) If CIGA has any covered claims, we then address the applicability of the 10 excluded categories (*id.*, subd. (c)(3)-(12)).

██ "[T]he scope of [CIGA's] obligation to pay and defend claims is defined in terms of the underlying insurance policy provisions." (*Isaacson v. California Ins. Guarantee Assn., supra,* 44 Cal.3d at p. 791.) "CIGA's statutory duties can best be defined by examining the contractual duties which were imposed upon the now insolvent insurer either by law or . . . policy provisions." (*California Ins. Guarantee Assn. v. Superior Court* (1991) 231 Cal.App.3d 1617, 1626 [283 Cal.Rptr. 104].) "[A]n insured should not be placed in a worse position by the accident of insurer insolvency . . . ." (*Id.* at p. 1628, fn. 11.)

(7b) CD Investment contends that each of the five policies issued by the insolvent insurers gives rise to a covered claim. We agree. If Mission National Insurance and Enterprise Insurance had remained solvent, they would have provided up to $500,000 in coverage under *each* of their respective policies. Had there been no insolvency, CD Investment would not have incurred $963,000 in out-of-pocket expenses. In accordance with the provisions in the insolvent insurers' policies, CIGA is obligated to make good on all of the policies, at least to the extent necessary to reimburse CD Investment's expenses. In this way, CD Investment is not put in a worse position as a result of the insolvency. We do not suggest that CD Investment would have exhausted the policy limits under the five policies. Rather, we

conclude that CD Investment had covered claims sufficient to pay its out-of-pocket expenses.

CIGA argues that there is only one covered claim here, relying upon various statutory terms—"*an* insolvent insurer," "*an* insurance policy," and "*any* claim." (See § 1063.1, subd. (c)(1), (7), (9), italics added.) According to CIGA, in order to find that there is more than one covered claim, we would have to rewrite the statutes to use "the" instead of "an" or "any." CIGA is wrong. Just the opposite is true.

"In construing [a] statute, [the] definite article '*the*' particularizes the subject which it precedes and is [a] word of limitation as opposed to [an] indefinite or generalizing force [such as] '*a*' or '*an*.'" (Black's Law Dict. (6th ed. 1990) p. 1477, col. 2, italics added.) While "the" refers to "something that . . . exists only one at a time" (Webster's 3d New Internat. Dict. (1993) p. 2368, col. 3), "any" means "one or some of whatever kind" or "unlimited in amount, quantity, [or] number . . ." (*id.*, p. 97, col. 3).

Consequently, the use of "an" and "any"—"an insolvent insurer," "an insurance policy," and "any claim"—compels the conclusion that, at least in this case, the underlying litigation involved the obligations of more than one insolvent insurer and gave rise to more than one covered claim. Further, the statutes define coverage using plural nouns, equating "covered claims" with the "obligations" of an insolvent insurer. As CIGA acknowledges in its brief, "[t]he proper interpretation of the statute, then, is that 'covered claim*s*' in general are those that are within the coverage of one or more insurance policies issued by one or more insolvent insurers." In sum, CD Investment has a covered claim under each policy.

### 3. *Excluded Obligations*

■ CIGA argues that, even if CD Investment would otherwise have had two or more covered claims, they are barred by three of the statutory exclusions. Not so. "[I]n spite of the statutory limitations on CIGA's liability it still has substantial obligations to the insureds of the insolvent insurer." (*California Ins. Guarantee Assn. v. Superior Court, supra*, 231 Cal.App.3d at p. 1626.)

As to the first exclusion, the statute provides that " '[c]overed claims' does not include *that portion of any claim*, other than a claim for workers' compensation benefits, that is in excess of five hundred thousand dollars ($500,000)." (§ 1063.1, subd. (c)(7), italics added.) This exclusion is not relevant, however, since CIGA will not have to pay more than $500,000 on

"any claim." Indeed, none of the covered claims exceed $500,000. CD Investment seeks reimbursement for $963,000 in out-of-pocket expenses. It has five covered claims. There is more than enough coverage—$2.5 million—to pay CD Investment's expenses without exceeding the $500,000 cap per claim. In that regard, it has been said that "CIGA's role is somewhat akin to that of the Federal Deposit Insurance Corporation in banking . . . ." (*California Ins. Guarantee Assn. v. Liemsakul* (1987) 193 Cal.App.3d 433, 439 [238 Cal.Rptr. 346].) Just as federal law generally insures a bank depositor's accounts up to a maximum of $100,000 per institution (12 U.S.C. § 1821(a)(1)), CIGA provides protection up to $500,000 for each covered claim.

Another statutory exclusion states that " '[c]overed claims' does not include . . . any claim to the extent it is covered by any other insurance of a class covered by this article available to the claimant or insured . . . ." (§ 1063.1, subd. (c)(9)(i).) This exclusion, too, is of no consequence. As alleged in the complaint, CD Investment's claims under the insolvent insurers' policies are not covered by any other insurance.

Finally, CIGA is not responsible for "that portion of any claim that is in excess of any applicable limits provided in the insurance policy issued by the insolvent insurer . . . ." (§ 1063.1, subd. (c)(6); see § 1063.12, subd. (a).) The complaint alleged that each of the five policies provided up to $500,000 in coverage. "The Guarantee Act limits the amount of a 'covered claim' payable by CIGA to a sum within 'any applicable limits provided in the insurance policy issued by the insolvent insurer' up to a maximum of $500,000. . . . CIGA's liability for reimbursement is thus limited to the lesser of $500,000 or the underlying policy limit." (*Isaacson v. California Ins. Guarantee Assn.*, *supra*, 44 Cal.3d at p. 790, fn. 9, citation omitted.) Accordingly, CIGA's maximum liability here is $500,000 per covered claim.

Both sides thoroughly discuss the holding in *Phoenix Ins. Co. v. United States Fire Ins. Co.* (1987) 189 Cal.App.3d 1511 [235 Cal.Rptr. 185]. That decision is distinguishable. In *Phoenix*, the court held that CIGA had to pay $360,000 on behalf of an insolvent insurer where there was other insurance exceeding $500,000, and the underlying action had settled for $1.8 million. CD Investment cites *Phoenix* for the proposition that CIGA can be liable for up to $500,000 per covered claim even if other insurance covers more than $500,000. But in *Phoenix*, CIGA did not raise, and the court did not address, the statutory provision that limits CIGA's liability to $500,000 (§ 1063.1, subd. (c)(7), formerly subd. (c)(6); see Stats. 1984, ch. 564, § 1, pp. 2203-2204; Stats. 1997, ch. 372, § 1; Stats. 1997, ch. 497, § 2.5). Although the

result in *Phoenix* suggests that the decision might support CD Investment's position, the analysis in *Phoenix* makes clear that it does not.

## C. *Scope of "Claim"*

 CIGA contends that we should disregard the number of insurance policies and hold that only one covered claim arose out of the underlying litigation. In insurance parlance, CIGA essentially contends that "claim," as used in the insurance guaranty context, is an "occurrence." As stated, the CIGA statute defines "covered claims" as the "obligations of an insolvent insurer," subject to certain exclusions. (§ 1063.1, subd. (c)(1)-(12).) "Occurrence," as it is often used in comprehensive general liability policies, means an "accident" or "event" including "continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (See, e.g., *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 16 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *City of South El Monte v. Southern Cal. Joint Powers Ins. Authority* (1995) 38 Cal.App.4th 1629, 1637 [45 Cal.Rptr.2d 729].)

As the courts of other states have recognized in applying their own insurance guaranty laws:

"[The statute] does not use the word 'occurrence'. It expressly applies the [monetary cap] to 'claims'. There is no basis for substituting the word 'occurrence' for 'claim' in order to aggregate multiple claims arising from a single accident.

"The plain meaning of the [statutory] text . . . does not support aggregation of multiple claims. A finding that only one claim may arise out of a single occurrence would largely defeat the remedial purpose of the . . . Guaranty Association Act—to protect claimants and policyholders from financial losses associated with the insolvency of an insurance company. Recovery against losses resulting from the insolvency of insurance carriers, which the Legislature intended to provide, would often prove illusory. Both the language of [the statute] and the Legislature's expressed intent align us with those courts holding that multiple claims may arise from a single occurrence." (*Oglesby v. Liberty Mut. Ins. Co.* (1992) 1992 Okla. 61 [832 P.2d 834, 840], fns. omitted; accord, *Connecticut Ins. Guar. v. Union Carbide* (1991) 217 Conn. 371, 382 [585 A.2d 1216, 1222]; *McMahon v. Caravan Refrigerated Cargo* (1991) 406 Pa.Super. 303, 307-308 [594 A.2d 349, 351], app. den. (1991) 529 Pa. 621 [600 A.2d 538].)

In creating CIGA, the California Legislature understood the difference between "claim" and "occurrence." That understanding is apparent in the

CIGA legislation itself. The statute defines "covered claims" as the "obligations of an insolvent insurer" and goes on to say that, with the exception of workers' compensation insurance, covered claims are limited to those where the "claimant or insured is a resident of this state at the time of the insured occurrence . . . ." (§ 1063.1, subd. (c)(1).) We therefore decline to interpret "claim" to be an "occurrence."

Nevertheless, the use of "occurrence" in the *insurance policy* defines the extent of CIGA's obligations since CIGA is responsible only for claims that are "within the coverage of an insurance policy of the insolvent insurer . . . ." (§ 1063.1, subd. (c)(1); see *Connecticut Ins. Guar. v. Union Carbide*, *supra*, 217 Conn. at p. 382 [585 A.2d at p. 1222].)

D. *Legislative History*

 Although "[l]egislative materials inform our construction of a statute only when the words of the statute are unclear . . . , a clear statement of intent may serve to confirm a provision's plain meaning." (*People v. Snook* (1997) 16 Cal.4th 1210, 1219 [69 Cal.Rptr.2d 615, 947 P.2d 808], citation omitted.) In the present case, CIGA's attempt to shirk any and all obligations of the insolvent insurers is inconsistent with the purpose of insurance guarantee laws in general and with the legislative history of the California statutes in particular.

In December 1969, the National Association of Insurance Commissioners (NAIC) approved a "model bill" to address the problems generated by insurer insolvencies. The bill was based in part on the insurance guaranty laws already enacted in several states, including California. (See 2 Proceedings of the NAIC (1970) p. 1099.) In fact, California Insurance Commissioner Richards Barger, who was instrumental in the passage of the CIGA bill, served on the NAIC subcommittee that drafted the model bill. Because both bills serve the same goal, the commentary on the model bill is helpful in discerning the purpose of the CIGA legislation. (Compare *California Union Ins. Co. v. Central National Ins. Co.* (1981) 117 Cal.App.3d 729, 733-734 [173 Cal.Rptr. 35] [relying on commentary to model bill], with *American Nat. Ins. Co. v. Low* (2000) 84 Cal.App.4th 914, 924-928 [101 Cal.Rptr.2d 288] [declining to rely on commentary to model bill where California provision differed from model bill].)

In drafting the model legislation, the NAIC commented that "[e]very insurance company failure undermines public confidence and hence the

value of the insurance institution whose very existence is the result of the public's desire and need to be and feel secure from risk." (2 Proceedings of the NAIC, *supra*, at p. 1098.) At its 1967 meeting, the NAIC stated its belief that "every promise to every policyholder should be kept fully. No policyholder should ever have to accept anything less than full performance of his contract." (*Ibid.*) At a meeting in June 1969, shortly before approving the model bill, the NAIC adopted a "position statement," to wit: "[N]o person should suffer as a result of the insolvency of an insurer and . . . we stand ready to supplement our past actions with the present action to assure this end." (*Ibid.*) By CIGA's count, 46 states have adopted insurance guaranty statutes.

After the California Legislature passed the CIGA legislation, Insurance Commissioner Barger explained: "The creation of the California Insurance Guarantee Association provides the insured public of the State of California with an additional protection by which those persons injured now have the assurance that their claims will be paid, notwithstanding the fact that their claims may be against an insolvent company. Granted, the record in California of insolvencies is exemplary, but this record should not deter the State from protecting even a minute segment of the public from losses occasioned by insurance company insolvencies. The creation of the California Insurance Guarantee Association fulfills this purpose." (Barger, *California Insurance Guarantee Association* (1970) 45 State Bar J. 475, 482.)

As indicated in an enrolled bill report, with the enactment of the CIGA statutes, California "created a system whereby all licensed insurers will contribute to pay any deficiency in the resources of an insolvent insurer so [that] damaged claimants can be paid in full . . . ." (Cal. Dept. Ins., Business and Trans. Agency, Enrolled Bill Rep., Assem. Bill No. 1310 (1969 Reg. Sess.) Aug. 13, 1969.)

Thus, the legislative history supports the conclusion that CD Investment is entitled to reimbursement for its out-of-pocket expenses. We recognize, of course, that CIGA does not *always* pay an insured "in full," nor is *every* promise by an insolvent insurer "fully kept." "[CIGA's] 'business' is providing insureds with a limited form of protection from financial loss occasioned by the insolvency of their insurer." (*Isaacson v. California Ins. Guarantee Assn.*, *supra*, 44 Cal.3d at p. 787.) "The statutory duty of CIGA is to provide . . . insolvency insurance to pay some (but not all) claims arising out of an insurance policy of an insolvent insurer." (*Interstate Fire & Casualty Ins. Co. v. California Ins. Guarantee Assn.* (1981) 125 Cal.App.3d 904, 908 [178 Cal.Rptr. 673].) Even so, "CIGA is required to pay [the

amount of] *all* 'covered claims' . . . ." (*California Ins Guarantee Assn. v. Argonaut Ins. Co.* (1991) 227 Cal.App.3d 624, 628 [278 Cal.Rptr. 23], italics added; see *Industrial Indemnity Co. v. Workers' Comp. Appeals Bd.* (1997) 60 Cal.App.4th 548, 556-557 [70 Cal.Rptr.2d 295].)

CIGA argues that we cannot consider any legislative history materials for two reasons. First, it asserts that such materials cannot be considered for the first time on appeal. That is incorrect. (See *In re Zacharia D.* (1993) 6 Cal.4th 435, 448, fn. 14 [24 Cal.Rptr.2d 751, 862 P.2d 751]; *People v. Ward* (1998) 62 Cal.App.4th 122, 128, fn. 2 [72 Cal.Rptr.2d 531].)

Second, CIGA contends that we cannot rely upon an enrolled bill report. On that point, we note that, on several occasions, our Supreme Court has relied on an enrolled bill report in interpreting a statute. (See, e.g., *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066, 1086 [90 Cal.Rptr.2d 334, 988 P.2d 67]; *Calatayud v. State of California* (1998) 18 Cal.4th 1057, 1071 [77 Cal.Rptr.2d 202, 959 P.2d 360]; *Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 1003 [73 Cal.Rptr.2d 682, 953 P.2d 858].) In general, the Courts of Appeal have also done so (see, e.g., *M & B Construction v. Yuba County Water Agency* (1999) 68 Cal.App.4th 1353, 1360-1361 [81 Cal.Rptr.2d 231]; *Engel v. Worthington* (1997) 60 Cal.App.4th 628, 633-634 [70 Cal.Rptr.2d 526]), though some have not (see, e.g., *People v. Ward, supra,* 62 Cal.App.4th at p. 128, fn. 2; *McDowell v. Watson* (1997) 59 Cal.App.4th 1155, 1161, fn. 3 [69 Cal.Rptr.2d 692]). In any event, we would come to the same conclusion without the report.

E. *Offset for Payments by Solvent Insurers*

CIGA contends that a "covered claim" cannot exceed $500,000 and, since the solvent insurers paid $1.5 million, CIGA has no duty to pay CD Investment anything. This contention fails for two reasons.

First, CIGA's contention assumes that CD Investment has only one "covered claim." We have already held to the contrary. CIGA correctly notes that the term "covered claims" does not include "*any claim* to the extent it is covered by any other insurance of a class covered by [the CIGA statutes]." (§ 1063.1, subd. (c)(9)(i), italics added.) From this, CIGA jumps to the conclusion that the payments by the solvent insurers relieve it of all obligations.

In our view, the "other insurance" provision simply ensures that CIGA is the insurer of last resort. If other insurance of a "covered class" is available

on a covered claim, CIGA is responsible only for the amount, if any, exceeding that coverage, up to a maximum of $500,000. (§ 1063.1, subd. (c)(7), (9).) But, as the plain language of the statute indicates, the "other insurance" limitation applies separately to each covered claim. Here, CD Investment has a separate covered claim under each of the insolvent insurers' policies, none of which were covered by any other insurance. Given the lack of other insurance, CIGA's $500,000 cap has not been met on any of those claims.

Second, CIGA's contention is flawed because it improperly uses the payments by the solvent insurers to offset (and in this case, eliminate) CIGA's own obligation to make payments on behalf of the insolvent insurers. On this issue, we do not write on a clean slate. The courts of other states, in applying their own insurance guaranty laws, have soundly rejected CIGA's interpretation. And while the language of the "other insurance" provisions may vary slightly from state to state, they are sufficiently similar for our purposes.

As the Supreme Court of Connecticut has explained: "The evident purpose of providing in [the 'other insurance' provision] for a reduction of a covered claim 'by the amount of any recovery' from other available insurance was to prevent a person from twice receiving benefits for the same loss or otherwise obtaining a windfall, not to reduce the amount of a claim for a loss that remains partially unsatisfied. . . .

"To construe [the 'other insurance' provision] to allow CIGA to offset its obligation as guarantor of the insolvent policies by amounts paid by solvent insurers that fall short of satisfying a claim for indemnification would seriously undercut the protection that the legislature intended to provide. . . . CIGA's proposed interpretation effectively reduces the coverage afforded by the insolvent policies to the extent of coverage available under the solvent policies even though the loss remains partially unsatisfied." (*Connecticut Ins. Guar. v. Union Carbide, supra,* 217 Conn. at pp. 388-389 [585 A.2d at pp. 1224-1225]; accord, *Alabama Ins. Guar. v. Magic City Trucking* (Ala. 1989) 547 So.2d 849, 851-853; *Property & Cas. Ins. Guar. F. v. Herder* (1988) 156 Ariz. 203, 205-208 [751 P.2d 519, 521-524]; *Bullock v. Pariser* (1983) 311 Pa.Super. 487, 493-494 [457 A.2d 1287, 1290-1291]; *RI Insurers' Insolvency Fund v. Benoit* (R.I. 1999) 723 A.2d 303, 306-308.)

The Nevada Supreme Court reached the same conclusion, pointing out that "the purpose of the [insurance guaranty] act is to place the insured in a position to recover the same amount available under the insured's policy, as

if the insurer had not become insolvent, subject only to certain limitations on [the Nevada Insurance Guaranty Association's] liability." (*Cimini v. Nevada Ins. Guar. Ass'n* (1996) 112 Nev. 442 [915 P.2d 279, 282].)

The New Mexico Supreme Court had this to say: "To require an offset, as the Association urges, of the amount recovered from the primary insurance carrier against the Association's liability would be absurd . . . . Moreover, to interpret the Act as the Association does would eviscerate its express purpose of avoiding financial loss to a legitimate claimant as a result of the insolvency of its insurer to which the claimant paid premiums." (*Aztec v. Prop. & Cas. Ins. Guar. Ass'n* (1993) 115 N.M. 475, 480 [853 P.2d 726, 731].)

In line with these authorities, we, too, believe that an offset would be inconsistent with the purpose of the CIGA legislation. Further, an offset would lead to absurd consequences.

For example, under CIGA's view, a company could purchase two successive policies, each from a different insurer, and each providing $500,000 in coverage. The insured is sued for several million dollars in a case alleging continuous and progressive property damage. One of the insurers has become insolvent, so the insured files a claim with CIGA. The insured also files a claim with the solvent insurer. The case settles for $1 million (a reasonable sum), and the solvent insurer pays its policy limits of $500,000. CIGA could then refuse to pay anything on the ground that the insured had already recovered $500,000. In addition, the insured would sustain a loss on the premiums paid to the insolvent insurer.

In contrast, if the insured had purchased only the policy from the insolvent insurer, it would still receive $500,000 (paid by CIGA), and it would receive all of the insurance benefits for which it had paid. Thus, under CIGA's interpretation, the insured would be put in a worse position for having bought two policies. We decline to apply the CIGA statutes in this manner. (See *County of Orange v. FST Sand & Gravel, Inc.* (1998) 63 Cal.App.4th 353, 360 [73 Cal.Rptr.2d 633].)

In closing, we emphasize that our decision is limited to successive insurance policies where one insurer is solvent and another is not. In this case, CD Investment contends that the five policies from the insolvent insurers provided it with four and one-half years of continuous coverage, and that, as to each policy, CIGA is obligated to pay its full $500,000 cap, and there is

no other available insurance. We use the term "successive" policies to describe this set of circumstances. We express no opinion on the application of the CIGA statutes to other situations, as where there is overlapping or secondary coverage, or where an insolvent insurer has issued multiple policies covering the same risk during the same policy period. (See *R. J. Reynolds Co. v. California Ins. Guarantee Assn.*, *supra*, 235 Cal.App.3d at pp. 600-601 [discussing overlapping coverage and secondary insurers].)[1]

DISPOSITION

The judgment is reversed. Appellants are entitled to costs on appeal.

Ortega, Acting P. J., and Vogel (Miriam A.), J., concurred.

A petition for a rehearing was denied December 27, 2000, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied February 14, 2001.

---

[1]In a petition for rehearing, CIGA argues for the first time that, even if it is liable for indemnity, the solvent insurers should bear all of CD Investment's defense costs. But in its respondent's brief, CIGA acknowledged that CD Investment's out-of-pocket expenses consisted of both indemnity and defense costs, and it drew no distinction between them. Because CIGA did not raise this issue in a timely manner, we do not consider it. (See *Gentis v. Safeguard Business Systems, Inc.* (1998) 60 Cal.App.4th 1294, 1308 [71 Cal.Rptr.2d 122].)